# EXHIBIT A

DocuSign Envelope ID: F292B49E-936A-4516-986D-9BE1ABDBB2CA

# MULTI-COLOR CORPORATION
# AT-WILL EMPLOYMENT, CONFIDENTIAL INFORMATION, RESTRICTIVE COVENANT, AND NON-DISCLOSURE AGREEMENT

As a condition of my employment with Multi-Color Corporation, its subsidiaries, affiliates, successors or assigns (together, the "**Company**"), and in consideration of my continued employment with the Company, my receipt of (a) the other compensation now and hereafter paid to me by Company, (b) my eligibility to participate in the Company's Sales Incentive Plan ("SIP") and (c) my receipt of confidential information, I agree to the following provisions of this At-Will Employment, Confidential Information, Restrictive Covenant, and Non-Disclosure Agreement (the "**Agreement**"):

1. **At-Will Employment**

I understand and acknowledge that my employment with the Company is for no specified term and constitutes "At-Will" Employment. I also understand that any representation to the contrary is unauthorized and not valid unless in writing and signed by the CEO of the Company. Accordingly, I acknowledge that my employment relationship may be terminated at any time, with or without good cause or for any or no cause, at my option or at the option of the Company, with or without notice. I further acknowledge that the Company may modify job titles, salaries, and benefits from time to time as it deems necessary.

2. **Confidentiality**

    A. *Definition of Confidential Information*. I understand that "**Company Confidential Information**" means all Trade Secrets (as defined in the Uniform Trade Secrets Act), as well as other confidential and proprietary information that is not a Trade Secret, but that relates to the Company's past, present or planned business and/or operations, which has not been released publicly by authorized representatives of Company, and which is known to me as a result of my employment with the Company, and includes, but is not limited to: any data or information, without regard to form, that is valuable to the Company and is not known by the public or others in the industry. To the extent consistent with the foregoing, Company Confidential Information includes, but is not limited to: (x) the identities of the Company's customers (the "Customers") (including, but not limited to, Customers on which I called or with which I become acquainted during the term of my employment) and the specific individual customer representatives with whom the Company works, the details of the Company's relationships with such customers and customer representatives, the identities of distributors, contractors and vendors utilized in the Company's business, the details of the Company's relationships with such distributors, contractors and vendors, and the nature of fees and charges made to the Customers; (y) non-public information and materials describing or relating to the Company's or affiliates' business or financial affairs, including but not limited to financial and/or investment performance information, margins, equipment, strategies, marketing plans, business plans, pricing information, personnel matters, products, operating procedures, organizational responsibilities, or policies or procedures of the Company; or (z) information and materials describing the Company's existing or new products and services, including analytical data and techniques, and product, service or marketing concepts under development at or for the Company, and the status of such development. Notwithstanding the foregoing, Company Confidential Information shall not include any such information which (i)

DocuSign Envelope ID: F292B49E-936A-4516-986D-9BE1ABDBB2CA

was known to the public or competitors prior to the time of disclosure by Company to me; (ii) becomes known to the public or competitors after disclosure by Company to me through no wrongful action or omission; (iii) is in my rightful possession, without confidentiality obligations, at the time of disclosure by Company to me; or (iv) was information known to me prior to my employment with the Company; provided that any combination of individual items of information shall not be deemed to be within any of the foregoing exceptions merely because one or more of the individual items are within such exception, unless the combination as a whole is within such exception. I understand that nothing in this Agreement is intended to limit my or other employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

B. *Nonuse and Nondisclosure*. I agree that during and after my employment with the Company, I will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Company Confidential Information, and I will not use the Company Confidential Information for any purpose whatsoever other than for the benefit of the Company in the course of my employment, or disclose the Company Confidential Information to any third party without the prior written authorization of the CEO of the Company. Prior to disclosure when compelled by applicable law; I shall provide prior written notice to the CEO of the Company. I agree that I obtain no title to any Company Confidential Information, and that as between Company and myself, the Company retains all Company Confidential Information as the sole property of the Company. I understand that my unauthorized use or disclosure of Company Confidential Information during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company. I understand that my obligations under this **Section 2.B** shall continue after termination of my employment.

C. *Defend Trade Secrets Act.* I acknowledge and understand that pursuant to the Defend Trade Secrets Act of 2016, an individual may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (i) is made (A) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding. Further, I acknowledge and understand that an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the employer's trade secrets to the attorney and use the trade secret information in the court proceeding if the individual: (iii) files any document containing the trade secret under seal; and (iv) does not disclose the trade secret, except pursuant to court order.

D. *Former Employer Confidential Information*. I agree that during my employment with the Company, I will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other person or entity with which I have an obligation to keep in confidence. I further agree that I will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such third party unless disclosure to, and use by, the Company has been consented to in writing by such third party.

E. *Third Party Information*. I recognize that the Company has received and in the future will receive from third parties associated with the Company, e.g., the Company's customers, suppliers, licensors, licensees, partners, or collaborators ("**Associated Third Parties**"),

DocuSign Envelope ID: F292B49E-936A-4516-986D-9BE1ABDBB2CA

their confidential or proprietary information ("**Associated Third Party Confidential Information**") subject to a duty on the Company's part to maintain the confidentiality of such Associated Third Party Confidential Information and to use it only for certain limited purposes. I agree at all times during my employment with the Company and thereafter, that I owe the Company and its Associated Third Parties a duty to hold all such Associated Third Party Confidential Information in the strictest confidence, and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out my work for the Company consistent with the Company's agreement with such Associated Third Parties. I understand that my unauthorized use or disclosure of Associated Third Party Confidential Information or violation of any Company policies during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company.

3. **Ownership**

A. *Assignment of Inventions*. As between Company and myself, I agree that all right, title, and interest in and to any and all copyrightable material, notes, records, drawings, designs, logos, inventions, improvements, developments, discoveries, ideas and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by me, solely or in collaboration with others, (i) that relates to the business of Company, (ii) that relates to Company's actual or demonstrably anticipated research or development, or (iii) that results from any work performed by me for Company and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to any of the foregoing (collectively, "**Inventions**"), are the sole property of Company. To the extent the Inventions include materials subject to copyright, I agree that the Inventions are done as "work made for hire" as that term is defined under U.S. copyright law, and that as a result, Company will own all copyrights in the Services. I further assign and agree to assign to Company without royalty or any other consideration all worldwide right, title, and interest I may have or acquire in and to any Inventions. I understand and agree that the decision whether or not to commercialize or market any Inventions is within Company's sole discretion and for Company's sole benefit, and that no royalty or other consideration will be due to me as a result of Company's efforts to commercialize or market any such Inventions.

B. *Pre-Existing Materials*. I will inform Company in writing before incorporating any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by me or in which I have an interest prior to, or separate from, my employment with the Company ("**Prior Inventions**") into any Invention or otherwise utilizing any such Prior Invention in the course of my employment with the Company; and the Company is hereby granted a nonexclusive, royalty-free, perpetual, irrevocable, transferable worldwide license (with the right to grant and authorize sublicenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Prior Inventions, without restriction, including, without limitation, as part of or in connection with such Invention, and to practice any method related thereto. I will not incorporate any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third party into any Invention without Company's prior written permission. I have attached hereto as Exhibit A, a list describing all Prior Inventions or, if no such list is attached, I represent and warrant that there are no such Prior Inventions. Furthermore, I represent and warrant that if any Prior Inventions are

DocuSign Envelope ID: F292B49E-936A-4516-986D-9BE1ABDBB2CA

included on Exhibit A, they will not materially affect my ability to perform all obligations under this Agreement.

        C.    *Moral Rights*. Any assignment to Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "**Moral Rights**"). To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

        D.    *Maintenance of Records*. I agree to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by me (solely or jointly with others) during the term of my employment with Company. The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that may be specified by Company. As between Company and myself, the records are and will be available to and remain the sole property of Company at all times.

        E.    *Further Assurances*. I agree to assist Company, or its designee, at Company's expense, in every proper way to secure Company's rights in the Inventions in any and all countries, including the disclosure to Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, and all other instruments that Company shall deem proper or necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to deliver, assign and convey to Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to all Inventions, and testifying in a suit or other proceeding relating to such Inventions. I further agree that my obligations under this **Section 3.E** shall continue after the termination of this Agreement.

        F.    *Attorney-in-Fact*. I agree that, if Company is unable because of my unavailability, mental or physical incapacity, or for any other reason to secure my signature with respect to any Inventions, including, without limitation, for the purpose of applying for or pursuing any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to Company in **Section 3.A** then I hereby irrevocably designate and appoint Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and on my behalf to execute and file any papers and oaths, and to do all other lawfully permitted acts with respect to such Inventions to further the prosecution and issuance of patents, copyright and mask work registrations with the same legal force and effect as if executed by me. This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

4. **Conflicting Obligations**

   A. *Current Obligations*. I agree that during the term of my employment with the Company, I will not engage in any other employment or activities that conflict with my obligations to the Company.

   B. *Prior Relationships*. Without limiting **Section 4.A**, I represent and warrant that I have no other agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, my obligations to the Company under this Agreement, or my ability to become employed and perform the services for which I am being hired by the Company. I further agree that if I have signed a confidentiality agreement or similar type of agreement with any former employer or other entity, I will comply with the terms of any such agreement to the extent that its terms are lawful under applicable law. I represent and warrant that after undertaking a careful search (including searches of my computers, cell phones, electronic devices, and documents), I have returned all property and confidential information belonging to all prior employers (and/or other third parties I have performed services for in accordance with the terms of my applicable agreement). Moreover, I agree to fully indemnify the Company, its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, subsidiaries, predecessor and successor corporations, and assigns for all verdicts, judgments, settlements, and other losses incurred by any of them resulting from my breach of my obligations under any agreement with a third party to which I am a party or obligation to which I am bound, as well as any reasonable attorneys' fees and costs if the plaintiff is the prevailing party in such an action, except as prohibited by law.

5. **Return of Company Materials**

   A. *Return of Company Property*. I understand that anything that I created or worked on for the Company while working for the Company belongs solely to the Company and that I cannot remove, retain, or use such information without the Company's express written permission. Accordingly, upon separation from employment with the Company or upon the Company's request at any other time, I will immediately deliver to the Company, and will not keep in my possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to, Company Confidential Information, Associated Third Party Confidential Information, all Company equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation, those records maintained pursuant to **Section 3.D**.

   B. *No Expectation of Privacy*. I understand that I have no expectation of privacy in Company property, and I agree that any Company property situated on Company premises, or held by third-party providers for the benefit of the Company, is subject to inspection by Company personnel at any time with or without further notice. I further acknowledge that I have no reasonable expectation of privacy in any computer, handheld device, telephone, voicemail, email or other technology system that is used to conduct the business of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to me, to ensure that the Company is licensed to use the software on the Company's devices in

v1

compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes in the Company's sole discretion. I also understand and agree that as it relates to the Company's desire to protect its confidential and proprietary information, I have no expectation of privacy as to any personal devices, systems, or equipment that I have used for Company purposes. I further agree that the Company, at its sole discretion, may have access to such personal equipment, devices, and systems to retrieve, destroy, or ensure the permanent deletion of Company information from such equipment or systems.

**6. Notification of New Employer**

In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my obligations under this Agreement.

**7. Non-Interference**

I agree that during the course of my employment and for a period of one (1) year immediately following the termination of my relationship with the Company, regardless of the reason, I will not, either directly or indirectly, interfere with the Company's customer relationships.

**8. Covenants to Protect Company Confidential Information**

A. *Non-Solicitation of Customers.* I agree that for a period of one (1) year immediately following the termination of my employment with the Company, whether I resign voluntarily or am terminated by the Company involuntarily, I shall not solicit, or cause to be solicited any Customer for the purposes of conducting business that is competitive with or similar to the Business or for the purpose of disadvantaging the Company's business in any way.

B. *Non-Competition.* I agree that during the term of my employment with the Company and for a period of one (1) year immediately following the termination of my employment with the Company, whether I resign voluntarily or am terminated by the Company involuntarily, I shall not perform services for another entity engaging in the Business, whether as an officer, director, employee, contractor, or consultant, that are the same or substantially similar to the services I provided to the Company at any time during the last one (1) year before the termination of my employment with the Company.

C. *Non-Solicitation of Employees.* I agree that for a period of one (1) year immediately following the termination of my employment with the Company, whether I resign voluntarily or am terminated by the Company involuntarily, I will not, in any manner, directly or indirectly, solicit, hire, attempt to solicit or attempt to hire any person who is known to me as a result of my employment with the Company, and who is or was an employee of the Company at any time during the one (1) year period before the termination of my employment with the Company.

D. *Definitions.* For the purposes of this Section 8:

(i) "Business" shall mean (x) the commercial production of decorative labels and; or (y) any other line of business in which the Company or any of its affiliates was engaged at any time during the one (1) year period prior to the date of my termination of employment (collectively the items in clauses (x) and (y), the "<u>Business</u>");

(ii) "Customer" shall mean all persons or entities (including customers and prospective customers of the Company) known to me as a result of my employment with the Company that have used, purchased, or inquired of the Company's services at any time during the one (1) year period preceding the termination of my employment with the Company, and with which I called upon, served, made a proposal to provide products to, sold to, or received Company Confidential Information about in preparation for making such a proposal, during the one (1) year period prior to the date of my termination of employment.

E. *Separate Covenants*. The covenants contained in subsections (A), (B), and (C) above shall be construed as a series of separate covenants. If, in any judicial or arbitral proceeding, a court or arbitrator refuses to enforce any of such separate covenants (or any part thereof), then such unenforceable covenant (or such part) shall be revised, or if revision is not permitted it shall be eliminated from this Agreement, to the extent necessary to permit the remaining separate covenants (or portions thereof) to be enforced. In the event that the applicable court or arbitrator does not exercise the power granted to it in the prior sentence, I and the Company agree to replace such invalid or unenforceable term or provision with a valid and enforceable term or provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable term.

**9. Miscellaneous**

A. *Governing Law; Consent to Personal Jurisdiction*. This Agreement will be governed by the laws of the state of Ohio without regard for conflicts of law principles. To the extent that any lawsuit is permitted under this Agreement, I hereby expressly consent to the personal and exclusive jurisdiction and venue of the state and federal courts located in Illinois for any lawsuit filed against me by the Company.

B. *Assignability*. This Agreement will be binding upon my heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns.

C. *Entire Agreement*. This Agreement, together with the Exhibits herein and any executed written offer letter between me and the Company, to the extent such materials are not in conflict with this Agreement, sets forth the entire agreement and understanding between the Company and me with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between us, including, but not limited to, any representations made during my interview(s) or relocation negotiations. I represent and warrant that I am not relying on any statement or representation not contained in this Agreement. Any

DocuSign Envelope ID: F292B49E-936A-4516-986D-9BE1ABDBB2CA

subsequent change or changes in my duties, salary, compensation, conditions or any other terms of my employment will not affect the validity or scope of this Agreement.

    D. *Headings*. Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

    E. *Severability*. If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

    F. *Modification*, Waiver. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the CEO of the Company and me. Waiver by the Company of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

    G. *Survivorship*. The rights and obligations of the parties to this Agreement will survive termination of my employment with the Company.

## 10. Protected Activity Not Prohibited

I understand and acknowledge that nothing in this Agreement shall in any way limit, restrict, or prohibit me from engaging in any Protected Activity. For purposes of this Agreement, "Protected Activity" means:

  A. filing a charge or complaint with the National Labor Relations Board, the Occupational Safety and Health Administration, the Securities and Exchange Commission, the U.S. Equal Employment Opportunity Commission, the New York Division of Human Rights, the Illinois Department of Human Rights, the U.S., New York State, or Illinois Departments of Labor, and/or and other federal, state, or local governmental agency or commission ("Governmental Agencies") or participating in any investigation or proceeding that may be conducted by any Governmental Agency;

  B. communicating with any Governmental Agency, including providing documents or other information without notice to the Company;

  C. reporting any good faith allegations of unlawful employment practices to any Governmental Agency;

  D. reporting any good faith allegation of criminal conduct to any appropriate government or law enforcement official;

  E. making any truthful statements or disclosures required by law, regulation, or legal process;

  F. requesting or receiving confidential legal advice.

  Notwithstanding the above, in making any such disclosures or communications, I agree to take all reasonable precautions to prevent any unauthorized use or disclosure of any Company Confidential Information to any parties other than the Governmental Agencies.

v1

DocuSign Envelope ID: F292B49E-936A-4516-986D-9BE1ABDBB2CA

SIGNATURE APPEARS ON NEXT PAGE

Date: 4/11/2023 | 2:11 PM PDT

*Mark Giuliani*
—41E82DC0A0614AB
Signature

Mark Giuliani

Name of Employee (typed or printed)

# EXHIBIT A

## LIST OF PRIOR INVENTIONS
## AND ORIGINAL WORKS OF AUTHORSHIP

| Title | Date | Identifying Number or Brief Description |
|---|---|---|
| | | |

__X__ No inventions or improvements unless listed above. [MG]

Date: 4/11/2023 | 2:11 PM PDT

Signature: Mark Giuliani
41E82DC0A0614AB...

Name of Employee (typed or printed): Mark Giuliani



# Multi-Color Corporation
# Americas Consumer Products and Food & Beverage Sales Groups
*Bonus Sales Incentive Program*
# CY2023 (January 1, 2023 through December 31, 2023)

---

**Overview:**

The Multi-Color Corporation Americas Consumer Products and Food & Beverage Sales Incentive Program is designed to reward sales associates for successful management of sales targets and sales growth. The Sales Incentive Program is a performance-oriented variable pay program designed to link sales force compensation to the overall success of Multi-Color Corporation. Achievement of specific financial and budgetary objectives as well as individual or team goals is rewarded through this program.

**Eligibility:**

Persons eligible for this program include full time associates in specific jobs as determined by the company on an annual basis. These jobs typically have titles such as: Account Executives, Sales Executives, National Account Managers, Sr. Account Executives and Global Key Account Managers. *Participants may be eligible for additional, supplemental incentive plans such as for Equipment Sales.* Eligible participants will be provided a program document outlining all provisions of their incentive program at least annually.

Newly hired associates within the calendar year will participate in the Program during full quarters and must be employed during the full quarter to be eligible to receive an incentive. Associates who begin a disability leave of absence will be pro-rated based on the time they are actively at work. Associates who transfer into this program will participate on a quarterly basis and must be in the position for a full quarter to be eligible to receive an incentive. Eligibility under any other incentive program will cease. Assuming the associate was on another incentive program, the associate may be eligible for a pro-rated portion of the prior incentive program according to the terms and provisions of that program.

Associates must be employed at the time the incentive payment is made to receive the payment.

**Base Salaries:**

Base salaries are considered payment for the effective management of assigned accounts, maintaining effective relationships, and growing sales year-over-year. Salaries are reviewed annually in conjunction with the annual merit and performance review process. Salary increases may be granted based on individual performance of the sales associate.

**2023 Bonus Structure**
*Growth % is calculated on your account list as of the last day of each Quarter.*
**Bonus Pool - 20% of Salary (50% Payable on Sales Growth and 50% Payable on CM Growth)**

| Sales Growth % | % of Bonus Pool |
|---|---|
| 1.50% | 10.0% |
| 2.00% | 25.0% |
| 2.50% | 50.0% |
| 3.00% | 75.0% |
| 3.50% | 100.0% |

| CM Growth % | % of Bonus Pool |
|---|---|
| 3.00% | 10.0% |
| 3.50% | 25.0% |
| 4.00% | 50.0% |
| 4.50% | 75.0% |
| 5.00% | 100.0% |



- On accounts that have two reps working as a team, commission is paid at 50% to each rep.
- Accounts may be added or removed during the year from the account list below. This will be approved at the sole discretion of the SVP of Sales and CEO
- Impact of major account changes (credits, damages claim, etc.) will be handled on individual basis at the sole discretion of the SVP of Sales and CEO
- 2023 Bonus Potential is based on Base Salary as of 1/1/2023
- Payment are calculated by hitting the percentage growth number, no rounding.
- At year end, if an overpayment was made, resolution will be determined at the sole discretion of the SVP of Sales and CEO.

**Bonus Payout Example:**
Bonus will be trued up and paid out on a quarterly basis at 50%. Final payment will be made in February of 2023. The example illustration below calculates the payout based on a **$100,000 annual salary**.

| Sales Growth Bonus | YTD Growth | Calculation | Payout | Reserve |
|---|---|---|---|---|
| 1st Quarter | 2.50% Growth | $ of Bonus Potential x .25 (Q1) / 2 (50% Paid/50% Reserve) | $625.00 | $625.00 |
| 2nd Quarter | 2.00% Growth | $ of Bonus Potential x .50 (Q2) / 2 (50% Paid/50% Reserve) – Q1 Payout | $0.00 | $625.00 |
| 3rd Quarter | 3.50% Growth | $ of Bonus Potential x .75 (Q3) / 2 (50% Paid/50% Reserve) – Q1 & Q2 Payout | $3,125.00 | $3,750.00 |
| 4th Quarter | 4.00% Growth | Bonus Potential – YTD Payouts | $6,250.00 | |
| | | TOTAL | $10,000.00 | |

| CM Growth Bonus | YTD Growth | Calculation | Payout | Reserve |
|---|---|---|---|---|
| 1st Quarter | 4.50% Growth | $ of Bonus Potential x .25 (Q1) / 2 (50% Paid/50% Reserve) | $937.50 | $937.50 |
| 2nd Quarter | 4.00% Growth | $ of Bonus Potential x .50 (Q2) / 2 (50% Paid/50% Reserve) – Q1 Payout | $312.50 | $1,250.00 |
| 3rd Quarter | 4.50% Growth | $ of Bonus Potential x .75 (Q3) / 2 (50% Paid/50% Reserve) – Q1 & Q2 Payout | $1,562.50 | $2,812.50 |
| 4th Quarter | 6.00% Growth | Bonus Potential – YTD Payouts | $7,187.50 | |
| | | TOTAL | $10,000.00 | |



**New Account Growth/New Account:**

Per the table below, a commission will be paid for sales to pure new customers or an account where we have not done business for at least 12 months, or sales to a new division or business unit within an existing customer. The new customer commission will be paid at the higher percentage for up to 24 months effective with the agreed upon date when commercial shipments began for the new business. After the initial 24 months, those sales will be considered existing account growth and any growth will be paid as outlined under the 2023 Bonus Structure portion of this program.

In addition, all/any machine sales made by <u>non-Equipment Solutions</u> sales associates are expected to be done in close partnership with the equipment salesperson to ensure the best overall customer experience. Upon sale, 50% of the equipment sale will be credited to the equipment salesperson and 50% to the label salesperson who deliver the machine sale.

| Months 1 to 12* | Months 12 to 24* |
|---|---|
| 6.0% | 3.0% |

<u>* Commission is paid on Contribution Margin. Commission is only paid when Account Manager is over 95% previous year's sales</u>.

## ADMINISTRATION

The Company retains the right to administer, interpret, modify, amend, suspend, or terminate all provisions of this program without prior notice to program participants. This program does not constitute an offer of continued or future employment, or an employment contract, either expressed or implied. The Company retains the right to terminate the employment of any associate at any time. The Company reserves the right to reassign or transfer accounts among sales associates in the best interest of the company or the customer. The EVP Sales and the Business Unit President reserves the right to adjust incentive payments based on significant events or performance deficiencies. An associate who fails to perform at an acceptable level will be deemed ineligible to participate in the full benefits of the program and may be disqualified from receiving all or part of any incentive compensation. Eligible participants will be provided a program document outlining all provisions of the incentive program at least annually.

All new customer business/profitability and machine sales must be approved by the respective EVP Sales, and the Business Unit President. Any questions regarding new business must be settled within the first 60 days of shipments and documented, including eligibility and start date. Items defined as an unearned windfall may be partially or totally included or excluded from incentive calculations.

Awards under the Sales Incentive Program will be paid quarterly as soon as practical after completion of quarterly audits of the program. Associates must be employed at the time the incentive payment is made to receive the payment. Associates who terminate voluntarily or involuntarily during the program year will not be eligible for an incentive payout except in the event of death, retirement, disability, or as part of a separation agreement at the discretion of the Business Unit President. In these cases, a pro-rated payment may be issued. Associates terminated for gross misconduct or policy violation will forfeit all incentive payments.

# Certificate Of Completion

Envelope Id: F292B49E936A4516986D9BE1ABDBB2CA                                                Status: Completed
Subject: Complete with DocuSign: 2023 MCC SIP (LFDC Bonus 3).pdf, 2023 NA FB SIP Letter v4.pdf, MCC At-W...
Source Envelope:
Document Pages: 15                          Signatures: 2                           Envelope Originator:
Certificate Pages: 4                        Initials: 1                             Christy Schultz
AutoNav: Enabled                                                                    Christy.Schultz@mcclabel.com
EnvelopeId Stamping: Enabled                                                        IP Address: 75.211.51.169
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

## Record Tracking
Status: Original                            Holder: Christy Schultz                 Location: DocuSign
    2/24/2023 2:25:15 PM           Christy.Schultz@mcclabel.com

| **Signer Events** | **Signature** | **Timestamp** |
|---|---|---|
| Mark Giuliani<br>mark.giuliani@mcclabel.com<br>Security Level: Email, Account Authentication (None) | *Mark Giuliani*<br>—41E82DC0A0614AB...<br>Signature Adoption: Pre-selected Style<br>Using IP Address: 97.86.240.76 | Sent: 2/24/2023 2:25:32 PM<br>Viewed: 3/1/2023 5:47:33 AM<br>Signed: 4/11/2023 2:11:51 PM |

**Electronic Record and Signature Disclosure:**
   Accepted: 3/23/2023 5:50:59 AM
   ID: f88c6dda-7273-4003-9fe9-5d56fedc64f1

| **In Person Signer Events** | **Signature** | **Timestamp** |
|---|---|---|

| **Editor Delivery Events** | **Status** | **Timestamp** |
|---|---|---|

| **Agent Delivery Events** | **Status** | **Timestamp** |
|---|---|---|

| **Intermediary Delivery Events** | **Status** | **Timestamp** |
|---|---|---|

| **Certified Delivery Events** | **Status** | **Timestamp** |
|---|---|---|

| **Carbon Copy Events** | **Status** | **Timestamp** |
|---|---|---|

| **Witness Events** | **Signature** | **Timestamp** |
|---|---|---|

| **Notary Events** | **Signature** | **Timestamp** |
|---|---|---|

| **Envelope Summary Events** | **Status** | **Timestamps** |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 2/24/2023 2:25:32 PM |
| Certified Delivered | Security Checked | 3/1/2023 5:47:33 AM |
| Signing Complete | Security Checked | 4/11/2023 2:11:51 PM |
| Completed | Security Checked | 4/11/2023 2:11:51 PM |

| **Payment Events** | **Status** | **Timestamps** |
|---|---|---|

**Electronic Record and Signature Disclosure**

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, Fort Dearborn Company (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Fort Dearborn Company:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: rweber@fortdearborn.com

**To advise Fort Dearborn Company of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at rweber@fortdearborn.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Fort Dearborn Company**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to rweber@fortdearborn.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Fort Dearborn Company**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to rweber@fortdearborn.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Fort Dearborn Company as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Fort Dearborn Company during the course of your relationship with Fort Dearborn Company.